IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 15-00305-01-CR-W-BCW |
| JOSEPH B. LEWIS, | ) | |
| | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Before the court is Defendant's motion to suppress evidence. Defendant moves the Court to suppress all evidence obtained from the July 7, 2015 seizure on grounds of a Fourth Amendment violation. For the following reasons, Defendant's motion should be denied.

## I. BACKGROUND

An indictment was returned on September 10, 2015, charging Defendant with one count of being a felon in possession of a firearm. On October 14, 2015, Defendant filed a motion to suppress evidence (Doc. No. 19). The government responded on October 21, 2015 (Doc. No. 23). An evidentiary hearing was held on November 19, 2015. The government appeared by Assistant United States Attorney Adam Caine. Defendant was present, represented by appointed counsel Marcus Ermine. The government called Independence, Missouri Police Department Detective Loran Freeman to testify. Ryan Drake testified on behalf of Defendant. The following exhibits were admitted into evidence:

    Government's Exhibit 1:    Diagram of Freaks Tattoo Shop
    Government's Exhibit 2:    Photograph of front room
    Government's Exhibit 3:    Photograph of front room
    Government's Exhibit 4:    Photograph of front room

| | |
|---|---|
| Government's Exhibit 5: | Photograph of tattooing area looking toward front room |
| Government's Exhibit 6: | Photograph of tattooing area |
| | |
| Defendant's Exhibit 1: | Photograph of Freaks Tattoo Shop |
| Defendant's Exhibit 2: | Photograph of Freaks Tattoo Shop |
| Defendant's Exhibit 3: | Photograph of Freaks Tattoo Shop |
| Defendant's Exhibit 4: | Photograph of Freaks Tattoo Shop |
| Defendant's Exhibit 5: | Photograph of Freaks Tattoo Shop |
| Defendant's Exhibit 6: | Photograph of Freaks Tattoo Shop |
| Defendant's Exhibit 7: | Photograph of Health Department Permit |
| Defendant's Exhibit 8: | Photograph of Freaks Tattoo Shop |

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact.

1. On July 7, 2015, Independence, Missouri Police Department Detective Loran Freeman went to Freaks Tattoo Shop in an attempt to locate a female named Chrystal Giltner who was a person of interest in a crime unrelated to the instant indictment (Tr. at 3, 27). Detective Freeman was undercover and acted as though he was interested in getting a tattoo (Tr. at 3-4, 27).

2. When a customer enters Freaks Tattoo Shop, they are greeted in the common area (Tr. at 56). If they want to get a tattoo, they are taken back to the work area where individual work stations and equipment are located (Tr. at 56, 57, 64). State regulations require the work areas to be separate and private (Tr. at 63).

3. As Detective Freeman entered Freaks Tattoo Shop, Defendant -- who was an employee there -- was seated at a desk in a common area inside the front door (Tr. at 4, 28; Gvt. Exh. 2). Detective Freeman spent five to ten minutes looking at different examples of tattoo art while waiting to see if Ms. Giltner would appear (Tr. at 8). When she did not appear, Detective Freeman left the business and sought instruction as to whether he should contact the employees

and let them know who they were looking for or just leave and come back another time (Tr. at 9, 28-29).

4. Detective Freeman and Detective Aaron Gietzen reentered Freaks Tattoo Shop ten to fifteen minutes later (Tr. at 9, 29). They were both in street clothes, but had their neck chains and badges displayed (Tr. at 10, 29). As they entered, there was a customer sitting in the common area, just inside the doorway to the left; Defendant was no longer at the desk (Tr. at 10-11, 34).

5. The reception desk in the common area had a bell and a "cash only" sign (Tr. at 31-32, 34, 56; Def. Exh. 2; Def. Exh. 3). The officers rang the bell on the desk in an attempt to get someone to respond (Tr. at 34).

6. The customer waiting in the common area indicated Defendant was in the back drawing a tattoo for him (Tr. at 11, 35).

7. Detectives Freeman and Gietzen walked behind the desk in the common area stood at an open door to the room which contained individual work stations (Tr. at 11-12, 35, 37). There was no signage or any indication that people were not allowed to enter the work area (Tr. at 22, 63-64, 66). Freaks Tattoo Shop employee Ryan Drake testified, however, that the desk was intended to serve as a visual barrier to keep people from just walking back there (Tr. at 64, 65).

8. For approximately two to three minutes, Detective Freeman knocked on the doorframe, identified himself and Detective Gietzen, and asked if anyone was there (Tr. at 12, 13).

9. When no one appeared, Detective Gietzen entered the work area and knocked on a closed door in the northwest corner of the room (Tr. at 13, 35). Defendant answered the door

3

and he and Detective Gietzen walked back to the work area (Tr. at 13-14, 40). The detectives identified themselves as law enforcement and explained they wanted to ask him some questions about Ms. Giltner (Tr. at 14). Detective Freeman asked if it would be okay to have the conversation in the work area so as not to divulge information to the customer in the common area (Tr. at 15, 41). Defendant agreed (Tr. at 15).

10. Standing essentially in the center of the room, Detective Freeman asked Defendant if Ms. Giltner worked there (Tr. at 16). Detective Gietzen then noticed a firearm in plain view on a shelf on the west side of the room and recovered it (Tr. at 16-17, 42, 48; Gvt. Exh. 6).

11. Defendant told the detectives he was sure they knew he was a felon and that he did not need a hassle (Tr. at 17). The detectives had been unaware Defendant was a felon (Tr. at 18, 43). Detective Freeman advised Defendant they would keep the firearm until they determined if there were any criminal issues associated with it (Tr. at 18). The detectives then provided Defendant their contact information, stated they would be in touch and exited the business through the front door (Tr. at 18).

12. Later that afternoon, Defendant called Detective Freeman with information about Ms. Giltner (Tr. at 18).

13. On July 8, 2015, Detective Freeman and Detective Sergeant Steve Boles returned to Freaks Tattoo Shop to speak with Defendant about the firearm (Tr. at 19, 44). They made contact in the lobby area and asked if there was somewhere private they could speak (Tr. at 19-20, 45). Defendant led them to the backroom adjacent to the work area, which is depicted in the top northwest corner of Government's Exhibit 1 (Tr. at 20, 45; Gvt. Exh. 1).

14. In response to Detective Freeman's questions about the firearm, Defendant stated

4

he received it twelve to twenty-four months ago from an individual he did not know by name as trade for a tattoo (Tr. at 21). Defendant was not taken into custody at the end of the conversation (Tr. at 21).

### III. LEGAL ANALYSIS

The Fourth Amendment prohibits warrantless searches subject to a few well-delineated exceptions. Coolidge v. New Hampshire, 403 U.S. 433, 454-55 (1971). One such exception is the plain view doctrine. "[I]n order to qualify for the plain view exception, it must be shown (1) that the initial intrusion which afforded the authorities the plain view was lawful; (2) that the discovery of the evidence was inadvertent; and (3) the incriminating nature of the evidence was immediately apparent." United States v. Clark, 531 F.2d 928, 932 (8th Cir. 1976). See also United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009). Defendant maintains that the July 7, 2015 warrantless search of Freaks Tattoo Shop does not satisfy the first or third prongs of this exception. I disagree.

Satisfaction of the first prong hinges on Defendant's expectation of privacy in the work area. The "Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises." United States v. Long, 797 F.3d 558, 565 (8th Cir. 2015)(quoting New York v. Burger, 482 U.S. 691, 699 (1987)). This protection does not extend, however, to "portions of a business open to the public." Long, 797 F.3d at 565 (citing Maryland v. Macon, 472 U.S. 463, 469 (1985)("[R]espondent did not have any reasonable expectation of privacy in areas of the store where the public was invited to enter and to transact business.")). Indeed, "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." Katz v. United States, 389 U.S. 347, 351 (1967). See also Wayne R. LaFave & Jerold H. Israel, Criminal Procedure §3.2(e) (1985)("Law enforcement

5

officials may enter commercial premises at the times they are open to the public . . . [but may not] enter without consent premises to which the public at large does not have access."). Whether an individual has "a subjective expectation of privacy is a question of fact." Long, 797 F.3d at 564-65 (quoting United States v. Perry, 548 F.3d 688, 691 (8th Cir. 2008)).

Here, Defendant did not have a reasonable expectation of privacy in the work area where the firearm was recovered. Freaks Tattoo Shop is a commercial establishment. Upon entering the business, customers are greeted in the common waiting area but actually receive tattoos in the work area. Importantly, customers are not prohibited from entering the work area. The common waiting area and work area were merely separated by an open entryway; there was not a door that could have been closed to prevent entrance into the work area. Furthermore, there was no signage or other indication that customers could not enter the work area or that it was for employees only. When Detectives Freeman and Gietzen entered Freaks Tattoo Shop, no one was sitting at the reception desk to prevent entry into the work area.

After ringing the bell to no avail, the detectives walked behind the desk and stood at the open entryway into the work area. There, they knocked on the doorframe, identified themselves and called out for an employee for approximately two to three minutes. The customer waiting in the common area told them an employee was in the back drawing a tattoo for him. Detective Gietzen then entered the work area and knocked on a closed door in the northwest corner of the room. Defendant answered the door and, upon request, agreed to speak with the detectives in the work area. Based on the lack of affirmative steps in place to exclude the public and Defendant's consent to speak in that location, I find Detectives Freeman and Gietzen's entry was lawful.

With regard to the third prong, Detective Gietzen was permitted to retrieve the gun for

6

officer safety when he saw it on the shelf. Defendant Gietzen did not know if the gun was loaded and, in addition to the detectives and Defendant, there was a customer in the common waiting area. Upon Defendant informing the detectives that he was a felon, the incriminating nature of the gun became immediately apparent. See United States v. Robinson, 756 F.2d 56, 60 (8th Cir. 1985); United States v. Malachesen, 597 F.2d 1232, 1235 (8th Cir. 1979).

## IV. CONCLUSION

For the above-stated reasons, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 4, 2015